## BECKLEY vs. MUNSON.

Where personal property was conveyed by a mortgage bill of sale, with power to sell and dispose of the same, or to manufacture it, in whole or in part, and the mortgagee exceeded the power conferred upon him, but the mortgager subsequently executed a bond, which recognized and sanctioned the acts of the mortgagee,—it was held, that such instrument bound the mortgager, in the same manner, as if the power to do acts had been originally conferred upon the mortgagee, by such mortgage.

If a mortgagee, holding property under a mortgage, with power to sell, or manufacture, exceed the power conferred by such mortgage, he is liable, for any loss which may result therefrom, unless there be a subsequent ratification of his acts, by the mortgager.

Parol evidence is not admissible, to vary a written instrument.

A trustee who compromises a claim against his *cestui que trust*, for less than the amount actually due, is not entitled to charge, in his account, a greater sum than the amount actually paid by him. Nor is the principle varied, where the compromise is effected by a copartnership, of which the trustee is a member.

Where it was stipulated, that, if the defendant should be obliged to sell any of his own property, at a loss, to raise funds, to pay the debts of the plaintiff, such loss should be reimbursed to him, and the defendant sold railroad stock and bonds, bearing interest at seven per cent, for that purpose ; it was held, that the only loss for which he could claim to be reimbursed was, the amount of actual sales, the broker's fee for selling, and

Beckley *v.* Munson.

the fair market value, at the time of sale ; and that neither a rise in value, *of the property sold, subsequent to such sale, nor subsequent dividends, nor* interest accruing thereon, could be taken into account, in ascertaining the amount to be reimbursed.

Where a bill in equity, for an account, is brought, by the mortgager of personal property, against the mortgagee, the latter can not charge, in his account, *the expense incurred by him, in such action. And his right even* to taxable costs, will depend upon the manner in which the trust has been executed.

A mortgagee, to whom property has been conveyed, to be converted into money, and applied to the payment of debts, can not subject the mortgager *to a loss, incurred by exchanging the same for railroad stock,*—and, where such exchange was made, and the stock kept on hand, for nine months, the mortgager receiving the dividends, and then sold, for less than the price at which it was originally taken, it was held, that, the mortgager was not liable for such loss.

Where one partner, having a large pecuniary interest in the firm, but being individually a debtor thereto, for a certain amount, as appeared by entries on their books, sold and conveyed to the other partner, " all his right, title and interest in and to all the property and estate, real, personal and mixed, belonging to, or which of right ought to belong to said firm ; " it was held, that such conveyance transferred to *the other partner, only his interest in* the concern, which remained, after deducting such indebtedness; and, that the amount, so charged to him individually, could not thereafter be collected of him.

Where the surety on a note, being indemnified for his liability, incurred expenses, in defending a suit, brought for the collection thereof, which defense was made, contrary to the expressed wishes of his principal, and after being notified by him, that there was no defense to such action ; it was held, that the principal was not liable to the surety, for such expenses.

THIS was a bill in chancery, praying for an account of certain property, conveyed to the defendant in trust.

The cause was referred to a committee, who, in their report, among other matters, found, that, on the 28th day of March, 1848, the plaintiff and William G. Pierce, were partners, in the name of Beckley & Pierce, in the manufacture of pig-iron, and were also partners with Henry L. Munson, in the name of " J. A. Beckley & Co.," in mercantile business.

Beckley & Pierce, on that day, executed to the defendant and Sally Beckley, a mortgage-deed of certain

real estate, the condition of which, was, that if the mortgagees paid, within one year from the date of said deed, certain claims against them, amounting in the whole, to about $17,000, (including debts to the said Sally, of about $2,500,) which the defendant had agreed to pay, the deed was to be void.

They also executed and delivered to the defendant, a mortgage bill of sale of certain railroad stock, coal, iron-ore, wood, and other articles of personal property, which he was authorized to sell and dispose of, or manufacture, in whole, or in part, as he should see fit,—the condition of which was, that if they paid certain specified debts, (substantially the same as those described in the mortgage of the real estate,) which the defendant had agreed to pay, the bill of sale was to be void.

They afterward, and, on the same day, executed to the defendant, another instrument, in which they stated, that it was deemed necessary for their interests, that the defendant should operate their furnace, standing upon the premises mortgaged to him, for the purpose of realizing the most from the property conveyed to him, the profits of which were to be applied to the extinguishment of their debts, and agreed, that in case he should be obliged to sell any of his own property, at a loss, to raise money to meet their debts, they would reimburse the loss to him, and would allow him for operating the furnaces, at and after the rate of $1,500 per annum.

J. A. Beckley & Co., and the defendant, on the same day, executed another instrument, by which they conveyed to him, the goods in their store, which he agreed to take at cost, and apply the amount in the payment of certain debts of the company, part of them mentioned in the mortgage deeds, amounting to about $3,100, if sufficient for that purpose, and account for any balance, that might remain.

Henry L. Munson subsequently conveyed to the plaintiff, all his interest in the property of J. A. Beckley & Co., and thereupon ceased to have any interest therein.

The defendant, immediately thereafter, took possession of all the property, real and personal, conveyed to him as aforesaid, and ran the furnace, until the 16th day of May, 1849, when Pierce assigned to the plaintiff, all his interest in the property mortgaged to the defendant, except the real estate owned by him ; and the plaintiff, as principal, and the defendant as surety, gave him a bond, agreeing to indemnify him from all the debts of the two firms of which he was a member, and the debts contracted by the defendant, as mortgagee.

The plaintiff, at the same time, in addition to his former mortgages, conveyed to the defendant all his interest in about eight or nine hundred tons of pig iron, then in possession of the defendant,—all the debts due to the late firms of Beckley & Pierce, and J. A. Beckley & Co., and certain other personal property, which conveyance was to be void, provided the plaintiff paid certain specified debts amounting to some $7,000, which the defendant had assumed to pay, and four promissory notes of the plaintiff, to Pierce, signed by the defendant as surety, given upon the purchase of his interest in the property of the two firms, and amounting to about $3,700,—and also indemnified and saved the defendant harmless from the bond to Pierce. And it was agreed, by the plaintiff, in the mortgage, that the defendant, in order to raise funds to discharge said debts, might, at any time, dispose of the property, accounting with the plaintiff, for any balance that might remain, after said debts should be paid and the defendant indemnified.

The defendant took possession of the property, thus conveyed to him, and operated the furnace in the manufacture of pig iron, until the 15th of April, 1850,—having the use of the plaintiff's real estate, mortgaged to him, and receiving the rents and income thereof, and assumed all the responsibilities and trusts, imposed upon him by said deeds, and in the prosecution of the business, and settlement of the debts, contracted new debts and liabilities, to a large amount, and paid large sums, in fulfillment of contracts previously entered into by the plaintiff.

In the early part of 1849, the iron market became very much depressed, and so continued, until the spring of 1851, in consequence of which, only comparatively small quantities of iron could be sold, and those, only at diminished prices; and, although the defendant was occasionally advised and requested, by the plaintiff, to sell iron for what it would bring, rather than suffer interest and expenses to accumulate, yet the defendant kept on hand, during a portion of that time, from twenty to thirty thousand dollars worth of iron, whereby considerable losses accrued, but the defendant, in so doing, acted in good faith, and, as he believed, for the interest of the plaintiff and his creditors.

The defendant's liabilities, for debts originally incurred by him, and subsequently contracted in the manufacture of iron, were, at various periods, not less than from thirty to forty thousand dollars, and, not being able to realize the necessary funds from the property mortgaged to him, he was obliged to resort to his private means, to the amount of several thousand dollars.

After the lapse of about two years, principally by reason of the operation of the furnace, new debts had been contracted, many of the old ones remained unpaid, and the closing of the trust was apparently as distant as at the time it was created. The depreciation of iron, the accumulation of interest, and the salary of the defendant, alarmed the plaintiff and many of his creditors, and subjected the defendant to numerous complaints, both for neglect and mismanagement, and a disposition to protract and delay the settlement of the trust.

The plaintiff, being desirous of diminishing the expenses incident to the trust, closing it up, stopping the salary of the defendant, and carrying on the business at the furnace himself, procured and delivered to the defendant, a bond, in the penal sum of $25,000, signed by himself and numerous securities, to indemnify the defendant against the claims and

demands, for which he was liable for the plaintiff, and there-upon the defendant released to the plaintiff all the real estate of the plaintiff, mortgaged to him.

This bond was given under the expectation, on the part of the plaintiff and his sureties, that the residue of the proper-ty held by the defendant in trust, consisting in part of about 850 tons of pig iron, and in part of debts and other personal property, should be sold, or converted into available means, to meet the outstanding liabilities, and that said trust should be closed up, as soon as practicable, which, it was believed, by all parties, might be done in some four or six months.

In this bond were recited the conveyances made to the defendant, the operation of the furnaces by him, his becom-ing surety for the plaintiff,—and, among other matters, it was stated *that, for the benefit of the business carried on by the defendant, he had indorsed and become surety for Hun-tington & Day, to the amount of some 7 or 8,000 dollars;* and, as mortgagee or otherwise, was liable to pay all the debts and claims that were then outstanding and unpaid, which had been contracted in his said business. The balance then due the defendant, for advancements made by him, for the benefit of the business, for his salary, fees and expenses in conducting the business, was supposed, in said bond, to amount to about $25,000; his liabilities were estimated at $26,000, and the assets in his hands at about $50,000. And it was further stated, in the bond, that it was understood that the defendant would, as soon as could conveniently be done, and according to his best judgment, convert the prop-erty remaining in his hands into money, and apply it toward his debt and liabilities.

It was provided, that the bond should be void, if the ob-ligors indemnified and saved the defendant harmless from all claims, debts, and liabilities, for which he had or might be-come liable, in the business conducted by him, and paid him what advances he had made, his salary, and what might be due him, from the plaintiff, after faithfully applying the

Beckley *v.* Munson.

avails of the property remaining in his hands, as fast as might conveniently be done.

It was further found by the committee, that in August, 1848, the defendant, with the knowledge and approbation of the plaintiff, commenced the sale of pig iron to Huntington & Day, to be by them manufactured into bloom and bar iron, receiving in payment, at the end of every month, the notes of Collins & Co., to whom their manufactured iron was sold. Afterward, when their credit had become impaired, and their responsibility regarded as doubtful, the defendant continued to furnish them with iron, gave them his notes, indorsed theirs, and suffered them to draw orders, upon his responsibility, to enable them to keep their works in operation, pay their workmen, and defray their other necessary expenses, until June 3, 1850, when their indebtedness to him, and his liabilities for them, amounted to $9,206.33, upon which there was a final loss of $1,206.42, which loss the defendant charged, in his account against the plaintiff.

On that day, Huntington having gone to California, where he subsequently died, Day, the other partner, mortgaged to the defendant, all their real and personal property, as security for their indebtedness and his liabilities. The mortgage was given to him, personally, without any description of him, as a mortgagee or trustee of the plaintiff.

The defendant, supposing it would be more advantageous to all parties in interest, to convert the pig iron on hand, into bloom and bar iron, undertook to operate the furnace mortgaged to him by Huntington & Day, and continued to operate it, until August, 1851, whereby he sustained a further loss of $6,512.15, which he also charged to the plaintiff.

The plaintiff was aware that sales of iron were made by the defendant, as mortgagee, to Huntington & Day, (but not of the amount,) and that the mortgage was taken for his benefit. But he supposed that the sales were made, under

an arrangement, that the defendant was to receive good notes, in payment, at the end of each month, or retain in his hands so much of the bloom and bar iron manufactured by them, as would secure their liabilities, except so far as more definite knowledge and approbation of the defendant's dealings ought to be inferred from the aforesaid bond.

While the defendant was operating the furnace of Huntington & Day, he supposed that the plaintiff was aware, that he claimed to be acting for him, and the plaintiff supposed he was acting for the mortgagees, and was accountable to the plaintiff, for the stock of the plaintiff used in said business.

The defendant, in his general account, charged for his salary, $5,650. . In reference to this subject, the committee found, that when the writings were drawn, the defendant claimed, that the trouble to which he might be subjected, could not then be known, and that, while he proposed that $1,500 should be inserted, as the price of his salary, he should not expect to charge that amount, unless he was subjected to unforeseen losses or unanticipated trouble. All parties, at that time, supposed the trust would be closed in six or twelve months, and that the plaintiff and Pierce would superintend and manage the furnace, and the manufacture of iron ; and it was under these circumstances that that sum was inserted in the agreement.

And, if the writing is not to govern the amount of salary, the defendant's services from April 1, 1848, to the middle of May, 1849, while the plaintiff and Pierce were running the furnace, under the charge of the defendant, were not worth more than at the rate of $800 *per annum ;* but, from that time until November 1, 1850, when said trust might have been closed up, but for operating Huntington & Day's furnace, as contemplated by the parties, when the aforesaid bond was given, the sum of $1,500, *per annum*, was no more than a reasonable compensation for his trouble ; nor was that salary more than was reasonable, up to the time of closing

that furnace, on the first day of August, 1851.   But, from that time to January 6th, 1852, $200 would have fairly paid for any services rendered in relation to the trust.

The committee further found, that H. Chapin & Co., of which firm the defendant was a member, and in which he was interested, to the extent of two-thirds of the profits of the business, purchased two claims against the plaintiff, at a discount of $136.76, and the defendant charged in his account, the full amount of those claims.

The first cost of the goods sold by J. A. Beckley & Co., to the defendant, amounted to $3,182.70.   They were afterward, by him, transferred and delivered to H. Chapin & Co., and, upon complaint made by Chapin, several months thereafter, that some of the articles had been injured, and were not worth the stipulated price, it was agreed that there might be a deduction of $42.10, and they were so credited by the defendant, and interest allowed upon them, from January 1st, 1849, except on $522.44, upon which interest was allowed from May, 1848.

The defendant, in order to meet certain debts of the plaintiff, and having no funds from which the amount could be raised, except said iron, sold certain railroad bonds, bearing an interest of 7 per cent., and certain railroad stock, paying a dividend of 5 per cent. semi-annually   The difference between the interest on the bonds and 6 per cent., up to March 1st, 1851, was $79.16, and the difference between the dividends upon the stock and interest to that time, was $133.33, and the difference between the value of the stock, when sold, and at that time, was $200.   The defendant paid for brokerage on such sales, $9.65.   These sums the defendant charged to the plaintiff.

The committee further found, that the defendant had expended and charged $177.32, for taking depositions to be used before the committee, in attending to the taking of the plaintiff's depositions, for board of counsel on the trial, and

their services ; in addition to which, other expenses had been incurred in the suit, which could not then be ascertained, and which the defendant would subsequently produce to the court.

The defendant, in October, 1850, sold a quantity of iron, of the plaintiff, to the amount of $2,000, and received in payment, twenty shares of railroad stock, then its market value, and kept the stock until July 16, 1851, receiving in the mean time, $105, in dividends, and then sold it for $1,575, and paid $10 for expenses of sale. He charged the losses arising upon this transaction, to the plaintiff.

After the mortgage to the defendant, of the property of Huntington & Day, and in consequence thereof, several of their creditors instituted suits against them, and factorized the defendant, and after several trials, it was found in all the suits, that the defendant was not indebted to them. In defending these suits, the defendant expended $197 more than he recovered, which sum he likewise charged to the plaintiff.

When Pierce conveyed his interest in the property of Beckley & Pierce, to the plaintiff, on the 16th of May, 1849, and the same was mortgaged anew to the defendant, the plaintiff as principal, and the defendant as surety, gave to Pierce, in part payment therefor, a negotiable note for $1,300, payable some months thereafter. Pierce, as claimed by the defendant, was indebted to the firm, on his private account, in a large amount, which, as the defendant claimed, was mortgaged to him. When the note fell due, it devolved upon the defendant to pay it, and he supposed and claimed, that the debt due from Pierce ought and could be applied in part payment of the note. But the plaintiff, in his negotiation with Pierce, had verbally agreed, that said debt should not be collected, but be discharged, and so notified the defendant, before any suit was commenced on the note, but the defendant was no party to that agreement, and never assented to the same. Pierce commenced a suit upon the

note, and the cause was referred to auditors, who reported in favor of Pierce, but the case still remained in court. The defendant charged, in his account, $156.59, fees paid counsel for defending said cause.

The committee found a balance, according to the defendant's account, embracing the items charged by him as aforesaid, of $14,367.54, subject to such modifications as the superior court might deem proper, upon the report of the committee.

The questions of law arising upon said report were, by the superior court for the county of Litchfield, reserved for the consideration and advice of this court.

*Perkins* and *O. S. Seymour* for the plaintiff.

*Hubbard* and *Sanford* for the defendant.

WAITE, J.  The first question, arising in the case, is, whether the defendant has rightfully charged the plaintiff with the losses, growing out of his business connection with Huntington & Day.

By the terms of the original conveyance, the defendant, for the purpose of raising money, to pay the debts assumed by him, was authorized to sell and dispose of the personal property assigned to him, as he saw fit.

Under that authority, he had a right to sell them iron, and upon credit, if necessary, and, had a loss arisen upon such sale, fairly made, it might, undoubtedly, have been charged to the plaintiff: so far, he might be considered as acting within the scope of his authority, as originally conferred.

But he has gone further, and not only sold them iron, but loaned them money, indorsed their notes, and guaranteed the payment of their orders, to enable them to carry on their business.  No such power was conferred upon him, by the instruments creating the trust, and, had the plaintiff done nothing more, he would not be liable for any loss, beyond such as arose from the sale of iron.

But, although the defendant acted originally without authority, yet, if his acts were done for the benefit of the trust, and were subsequently ratified by the plaintiff, with full knowledge of them, such ratification will bind him.  And, so far as the defendant's transactions with Huntington & Day, are concerned, down to April 15th, 1850, we are inclined to think, they have been ratified by the plaintiff's bond, of that date.  That instrument was given, that the defendant might be indemnified for his liabilities, incurred in the execution of the trust.  And, among the liabilities thus enumerated, is the one growing out of the Huntington & Day business.  The language of the condition of the bond is, that, whereas the defendant, *for the benefit of the trust business, has indorsed and become surety for Huntington & Day,* to the amount of some seven or eight thousand dollars, thereby recognizing the defendant's liability, as indorser and surety, as having been incurred *for the benefit, and in execution of the trust,* and against which the plaintiff agreed to indemnify him.

The defendant continued his business with them, as it had previously been conducted, until the third day of June, following, when they failed, and a new and different arrangement was made with them.  The loss, growing out of that business, down to that period, amounting to $1,206.42, we think, may rightfully be charged against the plaintiff, in consequence of the ratification contained in his bond, given a short time previous.

But, after that time, the defendant, instead of aiding Huntington & Day, with means to carry on their business, took their furnace into his possession, and continued the operation of it, for more than a year afterward.  We discover nothing, in any of the documents, or in any act of the plaintiff, authorizing this to be done at his expense.

He indeed knew of the mortgage from Day to the defendant, and supposed it was given for his benefit, that is, to secure those liabilities, for which the plaintiff had rendered

himself liable, by virtue of his bond ; but, at the same time, supposed that the defendant, in the management of their furnace, was acting as their agent, and, in that capacity, accountable to him for the iron used in the business,—a conclusion that any person, under such circumstances, would naturally have drawn, especially as it is not claimed, that the defendant ever consulted with the plaintiff, respecting the last arrangement.

Besides, the mortgage from Day was given to the defendant, in his own name, without any reference to his character, as trustee for the plaintiff,—a strong circumstance, indicating that it was then his intention to act for himself, and not for the plaintiff. But, as a heavy loss has been sustained in that business, he now claims a right to throw that loss upon the plaintiff.

Had the business been profitable, there is nothing in the case, showing that the plaintiff had any right to share in the profits. We think the defendant had no right, in the faithful execution of his trust, to place himself in such an equivocal position, that, if the business of operating the furnace of Huntington & Day, should prove successful, he could pocket the profits, and if unfortunate, charge the loss to the plaintiff. He should have either confined himself within the scope of the authority conferred upon him, or sought new power from the plaintiff.

The loss sustained by the defendant, in carrying on the furnace of Huntington & Day, subsequent to the 3d of June, 1850, amounting to $6,515.15, we think, ought to be stricken from his account.

2. Is the defendant entitled to the amount charged for his services? Although he informed the plaintiff, when the original writings were drawn, that, as the trouble to which he might be subjected, could not then be known, and he preferred that $1,500, *per annum*, should be inserted as his salary, yet he should not expect to charge that amount, unless he was subjected to unforeseen losses and unexpected

trouble; and the committee have found, that his services from April 1, 1848, to the middle of May, 1849, while the plaintiff and Pierce were running the furnace under his charge, were not reasonably worth more than at the rate of $800 *per annum*, yet we think the stipulated salary, during that period, must be allowed. It was the duty of the plaintiff, if he meant to have the salary a conditional one, so to have expressed it in the contract. In the absence of fraud, on the part of the defendant, (and none is found,) the amount of salary, as prescribed in the contract, must furnish the rule.

But the salary, by the terms of the contract, was to continue, only during the time of operating the furnace: business was continued by him only to the 15th of April, 1850, when the furnace, with other real estate, was re-conveyed to the plaintiff. After that period, he was entitled only to a reasonable compensation, which the committee have found to be at the rate of $1,500 *per annum*.

But they have further found, that the trust might then have been closed, as contemplated by the parties, when the bond of the 15th of April was executed, had it not been for operating the furnace of Huntington & Day, and that, as we have already seen, was a matter between the defendant and them, and not falling within the legitimate business of the trust. The defendant's salary, therefore, while attending to their business, must stand, as a matter between him and them, and ought not to be charged to the plaintiff.

3. The defendant had a right to charge the amount paid by H. Chapin & Co., of which firm he was a member, for the purchase of the two claims against the plaintiff, and no more. It is perfectly well settled, that, if he alone had made the purchase, he could charge only the amount actually paid. His rights are not enlarged, by associating others with him in the purchase. It would open a door to numerous frauds, on the part of trustees, were the rule otherwise.

Beckley *v.* Munson.

4. The plaintiff consented, that there might be a deduction of $42 from the price of the goods sold. It was, therefore, proper, that the balance only should be credited. It seems, that interest was not allowed upon the price of the goods, until some time after the sale. The reason why that was done, is not given. We are, therefore, not furnished with sufficient *data* to enable us to say, whether that postponement was rightfully made or not.

5. The plaintiff, in his contract with the defendant, agreed that, if the latter should be obliged to sell any of his own property, at a loss, to raise funds to pay the debts of the plaintiff, such loss should be reimbursed to him. The fair construction of that agreement is, that the loss contemplated by the parties, was the difference between the actual value of the property, and the price obtained, upon the sale of it.

But the defendant, under this agreement, claims a right to charge, not only the difference between the price obtained, and the value at the time of the sale, but at some future period, thereby taking advantage of any rise, subsequent to the sale. He also claims a right to charge the difference between six per cent. interest, and the interest payable on the railroad bonds, and the dividends paid upon the stock, up to a subsequent period.

Such losses are not within the fair meaning of the contract. The amount of interest payable on the bonds, and of the dividends upon the stock, are circumstances to be considered, in determining their value. A bond, bearing seven per cent. interest, would be considered more valuable than one of the same amount, at five per cent., and would probably sell for more in market. The sums, thus charged, we think, should be expunged from the defendant's account. But the sum paid for broker's fees, on the sales, ought, in some form, to be allowed, as that amount may fairly be considered as lost, by the sale.

6. There is nothing shown, in the report of the commit-

tee, which justified the charge of the defendant, for his expenses in the suit. His right even to taxable costs, if a balance should ultimately be found in his favor, will depend upon the manner in which it shall be found, that the trust has been executed. It is in the discretion of the court, to allow or refuse them, and it ought to be exercised, as it shall appear that the conduct of the defendant has been faithful or unfaithful.

7. The plaintiff conveyed his property to the defendant, that it might be converted into money, and his debts thereby paid. It was originally supposed, that the trust could be closed, in from six to twelve months. But the defendant went on with the business, for a period of more than two years, at a high salary, until the plaintiff and his creditors became alarmed, and the closing of the trust was apparently as distant, as when it was created.

Under these circumstances, in April, 1850, the plaintiff's bond of indemnity was substituted for the real estate mortgaged to the defendant, and in that bond it is expressly stated, that it was understood, that the defendant would convert the personal property in his possession, into money, as fast as it could conveniently be done, that it might be applied, in payment of the debts and liabilities, which it was then supposed by all parties, might be accomplished in from four to six months.

It was the duty of the defendant, under these circumstances, with all reasonable diligence, to convert the property into money, and pay off the debts. Instead of doing so, the committee find him, some six months afterward, disposing of $2,000 of the assets, in the purchase of railroad stock, which he subsequently keeps on hand, some nine months, receiving the dividends. This, in our opinion, was not a faithful execution of the trust, as contemplated by the parties, when the bond was given. He ought to have sold the iron, and not have used it, for the purpose of speculating in stocks. And, even if he could be justified in exchanging it

for such property, it was his duty to have sold the stock, within a reasonable time ; and it is fair to presume, that it might have been done, as it is found, that it was taken at its marketable value. The loss, incurred under such circumstances, in our opinion, is not justly chargeable to the plaintiff.

8. The expenses in those suits against him, in which he was charged as being the trustee and debtor of Huntington & Day, stand upon the same ground as his claim for losses in running their furnace. At least, no sufficient reasons are shown for making a distinction. In taking a conveyance of their property, and operating their furnace, he must be considered as acting for them, and not as the agent of the plaintiff, and if, in so doing, he induced a belief, on the part of their creditors, that he was covering up their property, in consequence of which, he was sued, as being their trustee and debtor, the expenses thereby incurred, are a matter entirely between him and them, and do not concern the plaintiff.

9. The only remaining inquiry is, whether the defendant is justified in defending the suit in favor of Pierce, and charging the expenses to the plaintiff. And why should he defend, and attempt to set off a pretended debt, due from Pierce, to Pierce and the plaintiff, when they were in partnership? Pierce had sold out to the plaintiff all his interest in that partnership, and, in consideration thereof, the plaintiff and defendant had given him their notes, to the amount of $5,000, and their bond to indemnify him against the partnership debts.

In that arrangement, the plaintiff had agreed that Pierce's debt should be discharged. And why should it have been done otherwise? He had purchased of him all his interest in the concern, and agreed to pay him $5,000, and assume all the debts. If there was a balance due from Pierce to the partnership, it would be natural for the parties to take

Beckley *v.* Munson.

that into consideration, in fixing the price that Pierce should receive for his interest in the concern.

It seems, that the business was so arranged, and the defendant was notified of the fact, before Pierce's suit was commenced. The only ground upon which the defendant could be justified, in making such a defence, is, that it was done either for the benefit of the plaintiff, or for the protection of the defendant; neither of which is shown. The plaintiff, surely, could not wish to defeat a just debt, by setting off a claim, which he knew had been satisfied. And there is no evidence, that he ever even countenanced the defence.

And as to the defendant, he, at that time, held a bond of indemnity, signed by numerous individuals, which the committee have found, was a satisfactory one, and no claim has been made, that he was not amply secured by that bond. It is not, therefore, shown, that the defence was either sanctioned by the plaintiff, or was necessary for the protection of the defendant; and, in our opinion, the expenses were unnecessarily incurred, and ought not to be charged to the plaintiff.

Our advice, therefore, is, that the balance, found due the defendant, by the committee, be corrected in the several particulars herein mentioned, and that a decree be made in conformity thereto.

In this opinion, the other judges concurred.

*Decree accordingly.*